U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

FEB - 4 2015

CLERK, U.S. DISTRICT COURT
By _____
            Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

USHEALTH GROUP, INC., §
§
    Plaintiff, §
§
VS. § NO. 4:14-CV-757-A
§ (Consolidated with
WILLIAM OLIVER SOUTH, § NO. 4:14-CV-758-A and
JERRY D. BLACKBURN, AND § NO. 4:14-CV-759-A)
GUSTAVO FRAGA, §
§
    Defendants. §

<u>MEMORANDUM OPINION</u>
and
<u>ORDER</u>

Now before the court for consideration are three petitions to compel arbitration pursuant to 9 U.S.C. § 4, filed in the above consolidated actions by defendants, William Oliver South ("South"), Jerry D. Blackburn ("Blackburn"), and Gustavo Fraga ("Fraga"). Plaintiff, USHealth Group, Inc., filed a consolidated response and appendix, and defendants filed a consolidated reply and appendix. Having now considered all of the parties' filings, as well as the applicable legal authorities, the court concludes that the petitions should be denied.[1]

---

[1] Each defendant filed a separate petition to compel arbitration and documents in support. Because two of the actions were transferred to the docket of the undersigned after the petitions were filed, the supporting documents were not prepared as spiral-bound appendices according to the undersigned's usual requirements. Hence, for ease of reference and efficiency, all references to defendants' petitions and appendices in this memorandum opinion and order are to those items filed by South. However, the petitions and supporting documents filed by Blackburn and Fraga are identical to those filed by South; hence, all references to "petition" or "appendix" apply to all defendants.

I.

## Procedural Background

In August 2014, plaintiff initiated three separate actions in the District Courts of Tarrant County, Texas, against South, Blackburn, and Fraga, each of which was subsequently removed to this court.  Blackburn and Fraga's actions were assigned to another judge of this court as Civil Case Nos. 4:14-CV-758-O and 4:14-CV-759-O, respectively.  The latter two cases were transferred to the docket of the undersigned where, because they involved common questions of law or fact, they were consolidated with the instant action.

II.

## Plaintiff's State Court Pleadings

The pleadings by which plaintiff initiated the state court actions alleged the following as to each defendant:

Plaintiff is an insurance holding company under the Texas Insurance Code that owns insurance-related subsidiaries, including Freedom Life Insurance Company of America ("Freedom Life"), USHEALTH Career Agency, Inc. ("USHEALTH Career"), and Small Business Insurance Advisors, Inc. ("SBIA").  South, Blackburn, and Fraga each had a prior contract with USHEALTH Career as an independent contractor insurance agent.  Defendants earned commissions payable by USHEALTH Career for sales of

coverage underwritten by Freedom Life.  "For a short period of time thereafter," Defs.' App.[2] at 44, each defendant had a similar contract with SBIA.

Plaintiff sent to each defendant a Conditional Offer Letter dated May 10, 2006, whereby plaintiff offered each defendant the opportunity to participate in plaintiff's Equity Incentive Plan (referred to by plaintiff as the "Restricted Stock Plan"),[3] pursuant to the terms and conditions of the Conditional Offer Letter and the Restricted Stock Plan.  As a condition of participation in the Restricted Stock Plan, "[c]onsistent with applicable federal securities law," the Conditional Offer Letter required each defendant to "truthfully and accurately represent" to plaintiff that "(i) he was an exclusive Regional Marketing Director of USHEALTH's subsidiary, USHEALTH Career insurance agency, and (ii) he was not in breach or violation of any of the terms of his agent contract with USHEALTH Career insurance agency, or (iii) derived more than 50% of his annual income . . . from USHEALTH Career insurance agency and the other subsidiaries of USHEALTH."  Id. at 44-45.  Each defendant executed and

---

[2]South submitted a spiral-bound collection of exhibits in support of his petition to compel arbitration which, although not titled as an appendix, the court will refer to herein as "Defs.' App."

[3]Plaintiff's response clarifies the Equity Incentive Plan included the Restricted Stock Plan. Defendants refer to the Restricted Stock Plan as the "EIP."

delivered his Conditional Offer Letter to plaintiff's home office in May 2006.

On April 13, 2010, plaintiff sent each defendant a letter informing him that a "timely, properly and truthfully executed affidavit" was a condition precedent to the distribution by plaintiff of any restricted common stock under the terms of the Restricted Stock Plan.  Id. at 45.  On April 19, 2010, South executed a sworn affidavit which stated, in pertinent part, that on January 10, 2010, March 15, 2010, and April 19, 2010, South was an exclusive insurance agent of, and not in breach or violation of his agent contract with, USHEALTH Career insurance agency.  Blackburn on April 23, 2010, and Fraga on April 26, 2010, each executed a similar affidavit with the same representations.[4]  Each defendant delivered his affidavit to plaintiff.

In reliance on each defendant's representations in his signed Conditional Offer Letter and April 2010 affidavit, plaintiff issued shares of its restricted common stock to each defendant.  Without such representations, plaintiff would not have issued the stock to defendants.

---

[4]The dates in Blackburn's affidavit were January 10, 2010, March 15, 2010, and April 23, 2010; those in Fraga's affidavit were January 10, 2010, March 15, 2010, and April 26, 2010.

Plaintiff's Restricted Stock Plan contained a provision affording plaintiff the right to repurchase the shares issued to defendants should their insurance agent relationship with USHEALTH Career terminate for any reason. Each defendant's relationship with USHEALTH Career and SBIA eventually terminated, and plaintiff executed its right to repurchase each defendant's shares of the restricted common stock. Plaintiff tendered payment to each defendant, which each one accepted, and each defendant's shares were surrendered and cancelled.

Subsequent to plaintiff's repurchase of the shares of stock from each defendant, the defendants made various false accusations concerning the stock's value, and have questioned the value and plaintiff's right to buy back the stock. This has caused plaintiff to question the original issuance of the stock, as well as question each defendant's entitlement to the stock or to compensation for its repurchase. Each defendant is alleged to have breached material provisions of the Conditional Offer Letter as would have precluded his participation in the Restricted Stock Plan and the issuance of any common stock thereunder.

Plaintiff alleged claims and causes of action against each defendant for breach of contract; breach of warranties and covenants; waiver, release, and accord and satisfaction; and for a declaratory judgment as to each defendant's rights or claims

with regard to the shares of common stock previously issued to each.

III.

## Defendants' Petitions to Compel Arbitration and Plaintiff's Response

A.   Background Information as Alleged in the Petitions

Each defendant was a regional manager with USHEALTH Career. In August of 2011, each defendant signed an Independent Marketing Organization Agreement ("Agreement") with USCARE Marketing, Inc.[5] A representative of the company also signed each Agreement.   The purpose of the Agreements was for defendants to avoid being "captive agents," which would have required them to market only the products offered by plaintiff and its subsidiaries, without regard to the superiority of any similar products offered by other companies that defendants also represented.

Defendants relied on representations by plaintiff that their stock could not be taken away and that plaintiff was committed to helping defendants grow their business, and they each worked diligently for plaintiff.   Defendants invested significant time and money to grow plaintiff's business in the Florida market. However, plaintiff withdrew some key products and overpriced

---

[5]USCARE Marketing, Inc. changed its name to SBIA on June 12, 2012.  The Agreements signed by each defendant in August 2011 contain the arbitration provision which defendants seek to enforce against plaintiff.

others, such that defendants were unable to meet their minimum requirements.  Plaintiff, by and through SBIA, then terminated the Agreements and forced defendants to allow plaintiff to repurchase all of the restricted stock issued under the Restricted Stock Plan for an amount "exponentially lower" than promised.  Pet. at 3.[6]

Each Agreement included a section titled "Mandatory Mediation and Binding Arbitration," requiring that

> all claims, disputes, and controversies arising out of or in any manner relating to this Agreement, or any other Agreement executed in connection with this Agreement, or to the performance, interpretation, application or enforcement hereto including, but not limited to, breach hereof (in each case, "Dispute"), shall be referred to mediation before, and as a condition precedent to, the initiation of any adjudicative action or proceeding, including arbitration, . . .

. . . .

> b.   <u>Mandatory Binding Arbitration.</u>  SHOULD MEDIATION BE UNSUCCESSFUL, IT IS AGREED THAT THE DISPUTE SHALL BE SUBMITTED TO BINDING, NON-APPEALABLE ARBITRATION AND THAT SUCH ARBITRATION SHALL BE GOVERNED BY THE TEXAS ARBITRATION ACT.

App. in Supp. of Pl.'s Consol. Resp. to the Pets. to Compel Arbitration Pursuant to 9 U.S.C. § 4 ("Pl.'s App.") at 36-37.

---

[6]References to "Pet." in this memorandum opinion and order refer to South's petition to compel arbitration.  As noted previously, Blackburn's and Fraga's petitions are identical.  Hence, the court considers all citations to South's petition to refer to all defendants.

The Agreements provided that the mediation and arbitration would be held in Tarrant County, Texas.

Following the termination of their employment and the Agreements, each defendant, through their current counsel, on December 3, 2012, sent an identical letter addressed to "USCARE Marketing, Inc.," and titled "Re: Demand for Mediation Pursuant to Independent Marketing Organization Agreement." Defs.' App. at 15. Towards the end of each letter, each defendant stated that he "hereby serves notice that he is invoking his right under Section 27(a) of the Agreement to submit this dispute to mandatory mediation prior to the institution of any further proceedings." Id. at 17.

Receiving no response, defendants' counsel on December 18, 2012, sent a second letter, again addressed only to "USCARE Marketing, Inc.," and titled "Re: Demand for Mediation Pursuant to Independent Marketing Organization Agreement Our Clients: William South, Jerry Blackburn and Gustavo Fraga." Id. at 18. The letter recounted the contents of the December 3 letter, noted the lack of response, and threatened that if no response was received within thirty days from the December 3 letter, the defendants would consider "the mediation provision, and all dependent provisions, of the Agreement waived," and they would instead pursue "all legal remedies." Id.

In separate letters dated December 28, 2012, SBIA indicated that it was formerly known as USCARE Marketing, Inc., acknowledged receipt of each defendants' December 3 letter, and confirmed that defendants had "initiated the mandatory dispute resolution procedures contained in the contract between" each defendant and USCARE Marketing, Inc. Id. at 20. Although denying the factual allegations contained in each defendant's letter, SBIA nevertheless accepted the initiation of the mandatory dispute resolution procedures in the Agreements. SBIA, however, disagreed with defendants' assertion that they were entitled to proceed in a single mediation, as opposed to three separate ones. Finally, each letter advised that

> in the event the parties are unable to resolve this dispute through the mediation process, USCARE [Marketing, Inc.] stands ready to proceed forward with the mandatory, binding arbitration procedures set forth in the contract to bring this matter to a final resolution, . . .

Id. at 21. Defendants' counsel responded on January 14, 2013, confirming the selection of a mediator, but again asserting the belief that defendants were entitled to a single mediation.

When no response was received to the January 14 letter, defendants' counsel on February 4, 2013, sent another letter addressed to USCARE Marketing, Inc., again threatening to consider the Agreements' alternative dispute resolution

9

procedures waived and to instead proceed with other remedies.   By
letter dated February 14, 2013, SBIA, in the interest of moving
the matter forward, agreed to a joint mediation.

A mediation was held on March 28, 2013, in Tarrant County,
Texas, between defendants and SBIA.[7] Following the unsuccessful
conclusion of the mediation, counsel for SBIA sent defendants'
counsel a separate letter for each defendant invoking the
mandatory arbitration provisions of the Agreements.   Of
particular importance to defendants is the following language in
the March 28 letters:

> In view of the fact that there remain outstanding
> Disputes, as defined in the underlying agreement
> between [defendant][8] and Small Business Insurance
> Advisors, Inc., f/k/a USCARE Marketing, Inc. ("SBIA")
> and USHEALTH Group, Inc. ("USHEALTH"), it appears it is
> time to move to mandatory, binding arbitration
> proceedings required by the agreement.
>
> Accordingly, on behalf of SBIA, USHEALTH, and all
> related entities, please accept this demand as our
> formal initiation of arbitration proceedings in
> connection with any and all claims between our
> companies and [defendant].
>
> During the unsuccessful mediation, it was suggested
> that your client might breach the underlying agreement
> and initiate judicial proceedings.   Please be advised
> that we will vigorously oppose any such effort to
> subvert the intent and express language of the
> underlying agreement, and will also seek to recover all

---

[7]There is no allegation, nor evidence in the record, that plaintiff in the instant action participated
in the mediation.

[8]SBIA sent an identical letter to each defendant.

10

fees and expenses incurred in connection with opposing any such suit.

Pl.'s App. at 67.  In their petitions defendants refer to the March 28 letters as the "Written Demands."

A dispute eventually arose between the parties concerning appointment of the arbitration panel.  Hence, on June 12, 2013, defendants filed a petition for declaratory judgment in the District Court of Tarrant County, Texas, 17th Judicial District, naming SBIA as the sole defendant.  An amended declaratory judgment petition was filed on March 4, 2014, again naming SBIA as the sole defendant.  Once the dispute was resolved, defendants on June 6, 2014, filed their Statement of Claims in the arbitration, naming only SBIA as respondent.  Only after plaintiff initiated the state court actions against defendants did defendants seek to compel plaintiff to join the arbitration.

B.   Grounds of the Petitions

Defendants rely on a number of theories to argue that the court should compel plaintiff to arbitrate its claims against them.  First, defendants urge the theory of direct benefits estoppel.  Next, in a related argument, defendants claim that estoppel supports their claims for arbitration because they have raised allegations of "substantially interdependent and concerted misconduct by both the non-signatory and the other signatory to

the contract." Pet. at 14. Defendants also contend that
plaintiff should be compelled to arbitration under the alter ego
doctrine. Finally, defendants contend that plaintiff's claims
against them are "inextricably intertwined" with and "inherently
inseparable" from defendants' claims against SBIA, and so must be
adjudicated in the same forum. Id. at 15.

C.   Plaintiff's Response

Plaintiff does not appear to directly respond to most of the
arguments raised by defendants. Instead, plaintiff contends that
the court should deny the petitions because: a lack of
arbitration agreement is fatal to defendants' petitions;
plaintiff's claims are not subject to any arbitration agreement;
defendants are estopped, and judicially estopped, from compelling
plaintiff to join the arbitration; and, defendants have waived
joining plaintiff in the pending arbitration.

IV.

Analysis

A.   Applicable Legal Principles Governing Arbitration

Defendants brought their petitions under the Federal
Arbitration Act ("FAA"), 9 U.S.C. § 4. The defendants'
Agreements with SBIA, however, specify that they are governed by
the Texas Arbitration Act ("TAA"), Tex. Civ. Prac. & Rem. Code §
171.002(a)(2). Where an arbitration agreement specifies that it

12

is governed by the TAA, state law governs all aspects of arbitration under the agreement.  See  Ford v. NYLCare Health Plans of the Gulf Coast, Inc., 141 F.3d 243, 247-49 (5th Cir. 1998); In re Olshan Found. Repair Co., LLC, 328 S.W.3d 883, 891 (Tex. 2010) (orig. proceeding).  Accordingly, the court will apply Texas law to the parties' dispute.[9]

"Texas law strongly favors arbitration."  Phillips v. ACS Mun. Brokers, Inc., 888 S.W.2d 872, 875 (Tex. App.--Dallas 1994, no writ).  Despite the strong presumption in favor of arbitration, under the TAA, when a party attempts to compel arbitration, the court must first determine whether a valid agreement to arbitrate exists between the parties.  J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 227 (Tex. 2003).

The general rule is that because arbitration agreements are contractual in nature, the court may not require a party to submit to arbitration unless it has agreed to do so.  Royston, Rayzor, Vickery & Williams, L.L.P. v. Lopez, 443 S.W.3d 196, 202 (Tex. App.--Corpus Christi 2013, pet. filed) (orig. proceeding).

---

[9]Plaintiff relies primarily on Texas law, while defendants cite a mixture of Texas and federal law. However, "[b]ecause of the similarities between the [Texas Arbitration Act] and the FAA, federal arbitration cases may constitute persuasive authority for interpreting the TAA." Tri-Star Petroleum Co. v. Tipperary Corp., 107 S.W.3d 607, 613 (Tex. App.--El Paso 2003, pet. denied).  Due to the similarities in state and federal law, under the circumstances in this action, the court finds the petitions would be denied regardless of the applicable law.

However, as an exception to the general rule, arbitration agreements may be enforced by or against non-signatories through traditional principles of state law such as "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." <u>Arthur Andersen LLP v. Carlisle</u>, 556 U.S. 624, 631 (2009); <u>see also</u> <u>In re Kellogg Brown & Root, Inc.</u>, 166 S.W.3d 732, 738 (Tex. 2005) ("under certain circumstances, principles of contract law . . . may bind a non-signatory to an arbitration agreement.").

B.    <u>Direct Benefits Estoppel Does Not Apply</u>

Defendants first rely on the doctrine of direct benefits estoppel to urge the court to compel arbitration. "Under 'direct benefits estoppel,' a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes." <u>In re Kellogg Brown & Root, Inc.</u>, 166 S.W.3d at 739 (citation omitted); <u>Carr v. Main Carr Dev., LLC</u>, 337 S.W.3d 489, 497 (Tex. App.--Dallas 2011, pet. denied). Hence, the court may compel a non-signatory to arbitration "if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provisions," or, under certain circumstances, if the party "deliberately seeks and obtains substantial benefits from the contract itself" outside

14

the context of its claim.  In re Weekley Homes, L.P., 180 S.W.3d 127, 131–32 (Tex. 2005).

Direct benefits estoppel prevents a party from "asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." Rachal v. Reitz, 403 S.W.3d 840, 846 (Tex. 2013) (citation omitted).  When a party's claims are based on an agreement containing an arbitration clause, such claims must be arbitrated; however, when the claims can stand independent of the agreement, the party may pursue them through litigation.  Id.  It is not enough that a non-signatory's claims "touch matters" that are included in, or are "dependent on," a contract.  Carr, 337 S.W.3d at 498. Rather, the non-signatory's "claims must rely on the terms of the contract."  Id. (citation omitted).

The basis of defendants' direct benefits estoppel theory is that "the stock under the EIP is directly related to [defendants'] Agreement with SBIA, USHEALTH's subsidiary, because, as soon as SBIA terminated the Agreement for an alleged lack of performance, USHEALTH alleges that it was authorized to force a buy-back of all of [defendants'] stock granted under the EIP." Pet. at 13.  Defendants also contend that plaintiff

referenced the Agreements several times in the state court
pleadings, and in particular, plaintiff alleged that it was
entitled to buy back each defendant's stock under the Restricted
Stock Plan because each defendant's "relationships with both
USHEALTH Career and SBIA were ultimately terminated, and USHEALTH
thereafter exercised its right to repurchase the previously
issued stock." Id.

Defendants' direct benefits estoppel theory misses the mark.
Contrary to defendants' assertions, the stock issued by plaintiff
under the terms of the Restricted Stock Plan was not directly
related to defendants' Agreements with SBIA.  Instead,
plaintiff's state court pleadings make clear that all aspects of
the stock, including plaintiff's right of repurchase, were
governed by the terms of the Restricted Stock Plan.  As alleged
in the state court pleadings, the Restricted Stock Plan
authorized plaintiff to buy back the stock if defendants'
employment ended for any reason, not just a reason related to the
Agreements.

Additionally, the documents on which plaintiff relies in
pursuit of its claims are the Restricted Stock Plan, the
Conditional Offer Letters, defendants' contract with USHEALTH
Career, and each defendant's sworn affidavit.  In particular,
plaintiff referred to the provision in its Restricted Stock Plan

16

that gave it the "right to repurchase any shares of restricted common stock issued to any eligible Restricted Stock Plan participant, such as the shares issued to Defendant[s], if the participant's insurance agent relationship with USHEALTH Career Insurance agency terminated for any reason." Defs.' App. at 46. Whatever the reason for each defendant's termination, plaintiff's Restricted Stock Plan, rather than the Agreements, served as the authority for plaintiff's stock repurchase. Nowhere in plaintiff's state court pleadings does it maintain that any provision of the Agreements should be enforced to its benefit. Nor have defendants directed the court to any provision of the Agreements which plaintiff is seeking to enforce, or which it has previously enforced to its benefit. Plaintiff's claims in this action are not alleged in any manner to "rely on" the terms of the Agreements.

Defendants' repeated contention that plaintiff referred to the Agreements also does not accurately represent plaintiff's pleadings. Plaintiff alleged that the Conditional Offer Letter sent to each defendant required the defendant to represent that he was "not in breach or violation of any of the terms of his agent contract with USHEALTH Career Insurance agency." Defs.' App. at 45. Each defendant executed his Conditional Offer Letter in 2006; each defendant executed his affidavit in 2010; and,

17

plaintiff issued the stock to defendants in 2010.  However, the Agreements were not executed by any defendant until 2011.  Thus, the only agreements on which plaintiff relied in issuing the stock were the Conditional Offer Letter, the Restricted Stock Plan, the affidavits, and the then-current agreement between each defendant and USHEALTH Career, and these are the only agreements on which plaintiff relies for its claims in its state court pleadings.

Defendants contend this is a "difference without a distinction," as they maintain that the Agreements were merely a continuation of defendants' prior agreements with SBIA's predecessor, and all such agreements allegedly also had arbitration agreements.  Defs.' Consol. Reply at 11.  In the court's view, however, the difference is significant.  While the prior agreements on which plaintiff relies may indeed have included arbitration agreements, those agreements are not in the record before the court.  No evidence exists to show that any prior agreement between plaintiff and defendants, particularly the "agent contract with USHEALTH Career" referenced in plaintiff's pleadings, included an arbitration agreement.

Direct benefit estoppel requires that claims must be arbitrated if "liability arises solely from the contract or must be determined by reference to it." <u>In re Weekley Homes</u>, 180

S.W.3d at 132.  Here, defendants have directed the court to
nothing showing plaintiff's claims against defendants arise from
the Agreements or must be determined by reference to them.
Accordingly, direct benefits estoppel is not a theory on which
defendants can successfully rely to compel arbitration.[10]

C.   "Substantially Interdependent and Concerted Misconduct"
     is not a Viable Theory

     Defendants also rely on the theory of "substantially
interdependent and concerted misconduct" by the non-signatory and
signatory to support their petitions.  In particular, defendants
rely on the following language from Meyer v. WMCO-GP, LLC:

> [A]pplication of equitable estoppel is warranted when
> the signatory to the contract containing an arbitration
> clause raises allegations of substantially
> interdependent and concerted misconduct by both the
> nonsignatory and one or more of the signatories to the
> contract. Otherwise the arbitration proceedings between
> the two signatories would be rendered meaningless and
> the federal policy in favor of arbitration effectively
> thwarted.

211 S.W.3d 302, 306 (Tex. 2006) (quoting Grigson v. Creative
Artists Agency, L.L.C., 210 F.3d 524, 527 (5th Cir. 2000)).  As
the factual basis for this theory, defendants maintain that they
and SBIA are involved in ongoing arbitration proceedings, where
one aspect of defendants' damages pertains to plaintiff's

---

[10]Defendants also rely on the Written Demands in support of the direct benefit estoppel theory.
The court will address the relevance of the Written Demand to all of defendants' claims in section IV. F.,
infra.

19

repurchase of the stock.  Now, in the instant action, plaintiff

is attempting to preclude defendants from claiming their

entitlement to the stock granted to them by the Restricted Stock

Plan.  Thus, according to defendants, "on the face of USHEALTH's

Complaint, there is certainly 'substantially interdependent'

conduct alleged" between plaintiff and SBIA.  Pet. at 14.

Defendants' reliance on Meyer affords them no relief, as the

Texas Supreme Court in a subsequent opinion limited the scope of

that decision.  As explained by one appellate court:

> A year after its decision in Meyer, the Texas
> Supreme Court explicitly rejected the second
> prong of Grigson, which includes intertwined
> claims or concerted misconduct.  See In re
> Merrill Lynch Trust Co. FSB, 235 S.W.3d 185,
> 195 (Tex. 2007) (orig. proceeding).  In so
> doing, the court distinguished Meyer,
> stating, "We noted allegations of concerted
> misconduct in Meyer v. WMCO-GP, LLC, 211
> S.W.3d 302, 306-07 (Tex. 2006), but compelled
> arbitration because the plaintiff's claims
> depended on the underlying agreement, and
> thus were governed by principles of
> direct-benefits estoppel."  Id. at 191 n.22.
> Thus, the court, while noting Meyer is still
> good law, limited Meyer to the first prong of
> Grigson.  Id. at 191-95.  The court noted
> that the intertwined claims doctrine is
> "generally limited . . . to instances of
> strategic pleading by a signatory" and then
> explicitly rejected the concerted misconduct
> test.  Id. at 194-95.  The court reasoned,
> "As other contracts do not become binding on
> nonparties due to concerted misconduct,
> allowing arbitration contracts to become
> binding on that basis would make them easier
> to enforce than other contracts, contrary to

the Arbitration Act's purpose." <u>Id.</u> at 194.

<u>Glassell Producing Co. v. Jared Res., Ltd.</u>, 422 S.W.3d 68, 82

(Tex. App.--Texarkana 2014, no pet.).  <u>Accord</u> <u>In re Trammell</u>, 246

S.W.3d 815, 821 (Tex. App.--Dallas 2008, no pet.) ("[A]rbitration

cannot be compelled based solely on substantially interdependent

and concerted misconduct.")(citing <u>Meyer</u>, 211 S.W.3d at 306).

Nothing further need be added to show why this theory fails.

D.    <u>Alter Ego</u>

Alter ego is one theory under which both state and federal

courts have held that a nonsignatory can be bound to an

arbitration clause.  <u>See</u>, <u>e.g.</u>, <u>Bridas S.A.P.I.C. v. Gov't of

Turkmenistan</u>, 345 F.3d 347, 356 (5th Cir. 2003) ("<u>Bridas I</u>");

<u>Glassell</u>, 422 S.W.3d at 84-85.  "Under the alter ego doctrine, a

corporation may be bound by an agreement entered into by its

subsidiary regardless of the agreement's structure or the

subsidiary's attempts to bind itself alone to its terms, when

their conduct demonstrates a virtual abandonment of

separateness."  <u>Bridas I</u>, 345 F.3d at 358 (internal quotation

marks and citation omitted).[11]  However, finding that the alter

---

[11]Defendants in their brief have cited to, and relied on, federal law concerning the alter ego doctrine. However, it appears that state law would apply instead, inasmuch as the arbitration agreement at issue states that it is governed by the TAA. <u>See</u> Flores v. Bodden, 488 F. App'x 770, 775-76 & n.3 (5th Cir. 2012). Plaintiff failed to address the alter ego doctrine in its response. Nevertheless, because the court finds insufficient evidence to support the alter ego theory under either Texas or federal authorities, it will apply federal law to the issue.

ego doctrine applies is by no means automatic. "Courts do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration." Id. at 359 (citation omitted). The court may compel a non-signatory to submit to arbitration under the alter ego doctrine "only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." Id.

As an initial matter, there are neither allegations in the petitions nor evidence in the record showing that plaintiff exercised complete control over SBIA in order to commit a fraud or wrong against defendants. The alter ego theory would fail on those grounds alone. Bridas I, 345 F.3d at 360 n.11 ("Once it has been determined that the corporate form was used to effect fraud or another wrong upon a third-party, alter ego determinations revolve around issues of control and use."); see, e.g., DAC Surgical Partners, P.A. v. United Healthcare Servs., Inc., No. H-11-1355, 2011 WL 3503066, at *3 (S.D. Tex. Aug. 10, 2011) (denying application of alter ego doctrine to compel arbitration absent allegations or evidence of control by a parent over its subsidiary to commit a fraud or injustice); Tejas Inc. v. Siemers, No. A-09-CV-0281 LY, 2009 WL 2762066, at *4 (W.D.

22

Tex. Aug. 26, 2009) (same).

For the first time in their reply, defendants maintain that the "fraud or wrong" perpetrated by plaintiff was that plaintiff, through the Written Demands, caused defendants to forego litigation and instead proceed to arbitration.  The court need not consider arguments raised for the first time in a reply brief.  See Benefit Recovery, Inc. v. Donelon, 521 F.3d 326, 329 (5th Cir. 2008).  In any event, this contention is unavailing, as the fraud or injustice must pertain to misuse of the party's corporate form.  Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 447 F.3d 411, 417 (5th Cir. 2006) ("Bridas II").

The primary factual basis supporting defendants' alter ego theory is the March 28 "Written Demands."  According to defendants,

> through the Written Demands, USHEALTH clearly demonstrated an abandonment of any separateness that USHEALTH might now claim from SBIA in regards to the Agreement and the pending arbitration and, thereby, submitted itself to the Agreement's arbitration requirement under the alter ego doctrine.

Pet. at 15.  Defendants have cited no authority to support their contention that a single letter such as the Written Demands sufficiently demonstrates "abandonment of separateness" so as to compel arbitration by a non-signatory.  Nor does defendants' reliance on Bridas support such a claim.  See 345 F.3d at 359

(remanding case for consideration of all relevant factors where
district court determined alter ego based solely on "existence of
corporate formalities and an absence of comingling of funds and
directors.").  As mentioned, there also appears to be lacking
from the petitions any allegation that plaintiff "exercised
complete control over the corporation with respect to the
transaction at issue" or that "such control was used to commit a
fraud or wrong that injured the party" advocating the alter ego
theory.  Id. at 358.

Expanding on the alter ego theory in their reply, defendants
recite the list of factors set forth in Bridas I that the court
is to consider when determining the question of alter ego:

> (1) the parent and subsidiary have common stock
> ownership; (2) the parent and subsidiary have common
> directors or officers; (3) the parent and subsidiary
> have common business departments; (4) the parent and
> subsidiary file consolidated financial statements; (5)
> the parent finances the subsidiary; (6) the parent
> caused the incorporation of the subsidiary; (7) the
> subsidiary operated with grossly inadequate capital;
> (8) the parent pays salaries and other expenses of
> subsidiary; (9) the subsidiary receives no business
> except that given by the parent; (10) the parent uses
> the subsidiary's property as its own; (11) the daily
> operations of the two corporations are not kept
> separate; (12) the subsidiary does not observe
> corporate formalities.

Id. at 360 n. 11.  In their reply, defendants identify the
following as supporting their alter ego theory: (1) SBIA is a
wholly-owned subsidiary of plaintiff; (2) the two entities have

24

common officers or directors; (3) the two companies have
identical business addresses; (4) all merchandise and
correspondence provided to defendants that purportedly came from
SBIA also bore plaintiff's name and logo; and, (5) plaintiff
offered incentives to agents who contracted with its subsidiaries
based on the agent's performance under those contracts.  The
court is not persuaded.

     As an initial matter, evidence in the record supports only
the first and third items cited above.  In support of the second
item, defendants included in their reply appendix unauthenticated
pages that appear to be printed from the Texas Comptroller's
website, purportedly showing commonality of officers between SBIA
and plaintiff.  However, only one officer--Cynthia Koenig,
treasurer--appears on both lists.  Defendants' own evidence
contradicts the fourth item: all of the correspondence from SBIA
to defendants that is included in defendants' appendices bears
only SBIA's name and logo, not plaintiff's.  And, nothing in the
record supports item number 5.

     Even if the court were to accept defendants' contentions at
face value, however, they would still be insufficient.  Courts
have refused to apply the alter ego doctrine even when confronted
with more substantial facts than are present here.  For example,
the court in Gardemal v. Westin Hotel Co., 186 F.3d 588 (5th Cir.

25

1999), found insufficient evidence of alter ego even though the corporate entity owned most of its subsidiary's stock, the companies shared corporate officers, the parent company required the subsidiary to use certain of its operations manuals, and the parent company oversaw advertising and marketing operations at the subsidiary. 186 F.3d at 593-94. And in Alpine View Co. Ltd. v. Atlas Copco AB, 205 F.3d 208 (5th Cir. 2000), the court rejected a claim of alter ego where the parent company owned all the stock of one of the subsidiaries, which in turned owned all the stock of other subsidiaries, the entities had several directors and officers in common, and the parent company received dividends from its subsidiaries that did business in Texas. 205 F.3d at 218-19. "[O]ne-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil." Gardemal, 186 F.3d at 594.

The foregoing authorities demonstrate why defendants have failed to meet their burden to show that SBIA is the alter ego of plaintiff, with the consequence that plaintiff cannot be compelled to arbitrate its claims against defendants on that theory.[12]

---

[12]In their reply, defendants also attempt to argue that plaintiff should be compelled to arbitrate
(continued...)

E.   **The Claims Are Not Inextricably Intertwined or Inherently Inseparable**

In a claim the contours of which are not completely clear, defendants contend that requiring defendants to litigate their claims against plaintiff in the instant action while also arbitrating their claims against SBIA would present a "likely possibility of irreconcilable factual findings and inconsistent judgments in light of [defendants'] claims, which implicate both the stock under the EIP and the Agreement with SBIA." Pet. at 16. Defendants thus contend that the "potential for factual and legal 'whip-saw' is simply overwhelming in the instant matter requiring adjudication only in the arbitration, as USHEALTH and SBIA are indispensable to [defendants'] ability to obtain complete relief." Id.

The basis of this claim is an opinion from the United States Court of Appeals for the Fourth Circuit, Owens-Illinois, Inc. v. Meade, 186 F.3d 435 (4th Cir. 1999). To fully explain the reason this case affords defendants no relief, a brief description of the factual and procedural background is helpful. Owens-Illinois, an Ohio company, entered into a settlement agreement with a group of plaintiffs who were seeking damages related to

---

[12](...continued)
based on the theory of agency. Defendants did not raise this issue in the petitions, and the court will not consider an argument raised for the first time in a reply brief. Benefit Recovery, Inc. v. Donelon, 521 F.3d 326, 329 (5th Cir. 2008).

asbestos-related illnesses.  Id. at 438.  Meade, one of the

plaintiffs' lawyers, terminated the agreement when he believed

Owens-Illinois failed to comply with its obligations thereunder.

Id.  Several asbestos-injured plaintiffs, who were residents of

both West Virginia and Ohio, then filed tort actions in state

court in West Virginia.  Id.

Attempting to prevent the plaintiffs from pursuing their

claims in state court, Owens-Illinois filed a petition to compel

arbitration in the United States District Court for the Southern

District of West Virginia, seeking to enforce the settlement

agreement's arbitration provisions.  Id. at 438-39.  The petition

limited the parties to those identified in an attached exhibit

which, in turn, named only plaintiffs who were residents of West

Virginia and excluded those who were residents of Ohio.  Id.

Owens-Illinois also filed a concurrent motion for temporary

restraining order and motion to stay the state court proceedings,

attempting to enjoin and stay litigation as to all the plaintiffs

in the state court action.  Id.

The district court determined that because Owens-Illinois

was attempting to enjoin all of the state-court plaintiffs,

including those from Ohio, from proceeding in state court,

diversity of citizenship was lacking, and the court had no

jurisdiction.  The district court also concluded that the non-

28

diverse Ohio plaintiffs were "necessary and indispensable parties" under Rule 19 of the Federal Rules of Civil Procedure, whose joinder would destroy diversity, and thus the case should be dismissed for want of jurisdiction.  Id.

The Fourth Circuit's analysis centered around whether the Ohio plaintiffs were indeed "necessary and indispensable parties" under Rule 19.  In answering the question in the affirmative, the court noted that, absent the required joinder of the Ohio plaintiffs, parallel actions would proceed in both state and federal courts.  Id. at 441.  Specifically, "both courts [were] being asked to make determinations on the validity and interpretation of the [settlement] Agreement, creating a high likelihood of incongruous results."  Id.  One court could compel arbitration, while the other could find that Owens-Illinois breached the settlement agreement and allow alternative judicial remedies.  Id.  Critical to the court's decision was the fact that a state court and federal court were each being asked to interpret the same agreement.  Id.

The instant action is both factually and procedurally distinct from Meade.  Perhaps the greatest distinction is that nothing in Meade addressed the question of whether a non-signatory to an arbitration agreement may be required to arbitrate its claims against a signatory.  The Meade court's

analysis instead concerned joinder of potentially "necessary and indispensable parties" under Rule 19, an issue not now before the court.  Further, the Meade court was concerned with two distinct courts interpreting the exact same agreement, again, not an issue now before the court.[13]

In contrast, plaintiff's claims here concern its Restricted Stock Plan and defendants' representations in the Conditional Offer Letters and 2010 affidavits, while defendants' claims in the arbitration against SBIA concern termination of the Agreements.  Defendants argue in their reply that adjudication of issues related to the Restricted Stock Plan would "necessarily require a determination of whether SBIA acted properly under the Agreement."  Pet. at 16.  However, this assertion is unsupported by the record, and the opposite appears true:  plaintiff alleged in the state court pleadings that the Restricted Stock Plan gave it the right to repurchase defendants' stock if their insurance agent contract terminated for any reason.  And defendants have failed to explain why they could not assert in this action whatever counterclaims they wished to raise against plaintiff pertaining to the value of their stock.

---

[13]Defendants have also failed to cite any Fifth Circuit authority, and the court has found none, employing the "factual and legal whip saw" analysis from Meade on which defendants rely.

F.    The "Written Demands" are not Agreements to Arbitrate

Much of defendants' petitions relies on the following language in the March 28, 2013 Written Demands:

> In view of the fact that there remain outstanding Disputes, as defined in the underlying agreement between [defendant][14] and Small Business Insurance Advisors, Inc., f/k/a USCARE Marketing, Inc. ("SBIA") and USHEALTH Group, Inc. ("USHEALTH"), it appears it is time to move to mandatory, binding arbitration proceedings required by the agreement.
>
> Accordingly, on behalf of SBIA, USHEALTH, and all related entities, please accept this demand as our formal initiation of arbitration proceedings in connection with any and all claims between our companies and [defendant].
>
> During the unsuccessful mediation, it was suggested that your client might breach the underlying agreement and initiate judicial proceedings. Please be advised that we will vigorously oppose any such effort to subvert the intent and express language of the underlying agreement, and will also seek to recover all fees and expenses incurred in connection with opposing any such suit.

Pl.'s App. at 67.   The court is not persuaded that the Written Demands constitute binding agreements to arbitrate, as defendants contend.

While defendants would have the court consider only the language referenced above, the court finds it appropriate to consider the language in context of the entire letter, as well as the course of conduct between the parties after the Written

_____

[14]SBIA sent an identical letter to each defendant.

31

Demands and prior to the initiation of this action.   In so doing,
the court finds that the Written Demands do not constitute
agreements to arbitrate, and were not considered by defendants to
be such until plaintiff initiated this action.

The Written Demands are on letterhead identifying only SBIA
as the sender.   The context of the Written Demands makes clear
that they were intended as a continuation of the mediation
engaged in by defendants and SBIA:

> This is in follow-up to the mediation that was
> conducted on this date.
>
> We were disappointed the parties were not able to reach
> an amicable resolution.

Id.   It is undisputed that plaintiff is not a signatory to the
Agreements.   Nor apparently is there any dispute that only the
defendants and SBIA participated in the mediation.   Both of these
facts make clear that the letters were not intended to apply to
plaintiff.   The purpose of the letters was to continue the
alternative dispute resolution proceedings consistent with the
requirements of, and the parties to, the Agreements.   Because
plaintiff was not a party to the Agreements, and did not
participate in the mediation, the most reasonable reading of the
letter is that SBIA was invoking the arbitration provision of the
Agreements, and the references to plaintiff were inadvertent.

This conclusion is bolstered by the following additional

facts, concerning the parties' course of conduct following the Written Demands, which demonstrate the parties' understanding that plaintiff neither offered to arbitrate nor intended to be included in the arbitration:  Following receipt of the Written Demands by defendants, a dispute arose regarding appointment of the arbitration panel.  In a letter dated May 27, 2013, defendants designated their arbitrator.  The May 27 letter was addressed only to SBIA and specifically addressed defendants' Agreements with SBIA.

On May 29, 2013, defendants' counsel sent a letter, again addressed only to SBIA, that referenced "your written demand for arbitration dated March 28, 2013," id. at 258, and indicated defendants were naming a second arbitrator in light of SBIA's failure to make its designation pursuant to the terms of the Agreements.  SBIA's counsel responded by letter dated May 31, 2013, on letterhead bearing only SBIA's logo, disputing the contentions in defendants' letter.  Defendants' counsel responded via a letter dated June 3, 2013, again addressed solely to SBIA.

Apparently unable to resolve the dispute, defendants on June 12, 2013, filed a petition for declaratory judgment in the District Court of Tarrant County, Texas, 17th Judicial District, against SBIA.  Plaintiff was not named as a party.  In the petition, defendants sought a declaration of certain rights under

33

the Agreements, such as the right to select the second arbitrator and to consolidate the three arbitrations into one. Several months later, on March 4, 2014, defendants filed an "amended original petition for declaratory judgment," again naming only SBIA as the defendant. During the course of the declaratory judgment action, at a hearing on a number of motions filed by the parties, the following exchange took place between counsel for plaintiff and counsel for defendants:

> MR. JACKSON: Are you contending that USHEALTH Group is going to be compelled to arbitration with your clients?

> MR. STOK: No. We didn't ask for that. It was not in the demand. We're only asking for arbitration with SBIA, and the letters are unmistakably clear as that no demand was made to arbitrate with USHEALTH Group, and you know that.

Pl.'s App. at 162.

The declaratory judgment action was apparently resolved, and on June 6, 2014, defendants filed their initial Statement of Claims in their arbitration proceeding, which indicated that it pertained to the arbitration between defendants and SBIA. Not until October 24, 2014--seven days after plaintiff filed its response to the petition to compel arbitration in the instant action--did defendants amend their Statement of Claims to include plaintiff.

The foregoing description of events following the Written

34

Demands leads to but one conclusion: defendants did not consider
the Written Demands to be offers by plaintiff to arbitrate.  All
of defendants' actions following receipt of the Written Demands
indicate that they intended to proceed with arbitration only
against SBIA.  No attempt was made by defendants to include
plaintiff in any of the communications or state court proceedings
for a period of more than a year leading up to the filing of
their initial Statement of Claims in the arbitration.  Only after
plaintiff filed its response to defendants' petitions in this
action did defendants amend the Statement of Claims to assert
claims against plaintiff.

Defendants attempt throughout their petitions to excuse this
lack of inclusion by contending that plaintiff "through the
Written Demands, had already submitted itself to the arbitration
proceedings," so defendants brought the declaratory action
against SBIA as "the only company that was resisting
arbitration."  Pet. at 7.  This explanation borders on the
absurd.  Nothing in the record before the court can be
interpreted as SBIA "resisting" arbitration.  All of the
correspondence between the parties shows progress, albeit slow,
by SBIA and defendants towards appointing arbitrators and
proceeding to arbitration.  Never in any of the correspondence or
other documents in the record does SBIA raise any opposition to

arbitration; in fact, the opposite is true.  Nor can defendants'
conduct reasonably be viewed as that of individuals who
considered plaintiff a party to the arbitration proceedings.[15]

In short, the court is not persuaded that the Written
Demands constitute consent by plaintiff to arbitrate its claims
against defendants.  The court finds defendants' characterization
of the Written Demands to be nothing more than a post-hoc attempt
to avoid litigation with plaintiff.

## V.

## Order

Therefore,

The court ORDERS that defendants' petitions to compel
arbitration be, and are hereby, denied.

SIGNED February 4, 2015.

JOHN McBRYDE
United States District Judge

---

[15]Defendants also rely on an undated decision from the arbitration panel concluding that plaintiff
appears to be a "proper and necessary party" to the arbitration "based on the information received by the
Panel thus far." App. in Supp. of Defs.' Consol. Reply at 2.  There is no indication in the record of the
nature of the information considered by the panel or the legal standards used to make such a
determination.  Accordingly, the court is affording little weight to the panel's conclusion.